**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.  1:24-mj-02537 Louis

UNITED STATES OF AMERICA

V

PAUL OSWALD MORANI,

Defendant.

_____/

> FILED BY_____ER_____D.C.
>
> **Mar 19, 2024**
>
> ANGELA E. NOBLE
> CLERK U.S. DIST. CT.
> S. D. OF FLA. - Miami

**CRIMINAL COVER SHEET**

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek M. Maynard)?     NO

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)?     NO

3. Did this matter involve the participation of or consultation with now Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023?                                             NO

4. Did this matter involve the participation of or consultation now Magistrate Judge Marta Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024?                                             YES

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:     /s/ *Andrea Goldbarg*

ANDREA GOLDBARG
Assistant United States Attorney
Court ID A5502556
JLK Federal Justice Building
99 Northeast 4th Street
Miami, Florida 33132-2111
Telephone: 305-961-9309
Email: Andrea.Goldbarg@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No.  1:24-mj-02537 Louis |
| | ) | |
| PAUL OSWALD MORANI, | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___January 2018 to March 2024___ in the county of ___Miami-Dade___ in the ___Southern___ District of ___Florida___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(h) | Conspiracy to Launder Monetary Intruments |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Patrick Betters, Special Agent DEA
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by __Face Time__

Date: __March 19 2024__

_____
*Judge's signature*

City and state: _____Miami, Florida_____

Hon. Lauren F. Louis, United States Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

Your Affiant Patrick Betters, first being duly sworn, states as follows:

1. I am a Special Agent with the Drug Enforcement Administration (DEA) and have so been so employed since 2018. Upon being hired as a DEA Special Agent, I attended a sixteen week DEA academy in Quantico, Virginia where I received training in all aspects of narcotics investigations. I am currently assigned to the DEA Miami Field Division. As a Special Agent with DEA, I have participated in numerous narcotics investigations involving narcotics trafficking and money laundering violations, the control and administration of confidential sources, international drug trafficking organizations and international drug importation, transnational crime, and undercover operations. During my career in law enforcement, I have worked and consulted with numerous law enforcement officers experienced in drug investigations, and spoken with numerous informants and suspects regarding the practices of drug trafficking and money laundering organizations. I have previously investigated smuggling, trafficking, and money laundering operations in Peru, Mexico, Guatemala, and Colombia.

2. As a law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code, I am empowered by law to conduct investigations of and make arrests for, but not limited to, offenses enumerated in Titles 18, 21, and 46 of the United States Code.

3. The information contained in this affidavit is submitted for the sole purpose of establishing probable cause to arrest PAUL MORANI for violations of Title 18, United States Code, Section 1956(h), having knowingly conspired with at least one other person to launder monetary instruments, that is, to transport, transmit, and transfer, and attempt to transport, transmit, and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside

the United States, knowing that the monetary instruments and funds involved in the transportation, transmission and transfer represent the proceeds of some form of unlawful activity and knowing that the transaction was designed in whole and in part to conceal and disguise nature, location, source, ownership, and control of proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

4.      Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not contain all of the information known to me and other law enforcement officers involved in this investigation.  The facts and information contained in this affidavit are based on my personal knowledge and observations, as well as upon information received in my official capacity from other individuals, including other law enforcement officers involved in this investigation, as well as my review of records, documents, and other physical items obtained during the course of this investigation.

## **PROBABLE CAUSE**

5.      In February 2019, law enforcement officers were investigating a Brazilian target who was sending fentanyl to the United States via the U.S. Postal System.  As part of the investigation, law enforcement learned that this target wanted to purchase approximately one hundred kilograms of cocaine that was located in the Southern District of Florida, for importation into Europe.  As part of this purchase of cocaine, the target[1] sent over $30,000 as a down payment for the cocaine.  This payment came in the form of a wire transfer from a U.S. based company called Compass Forwarding, Inc. located in the Southern District of Florida.   Compass

---

[1]      This individual was eventually convicted for illegal importation and distribution of fentanyl into the United States.

Forwarding is owned by the defendant, Paul Morani ("Defendant" or "MORANI"), and the bank account for Compass Forwarding, Inc. is also owned by the defendant.

      6.    Over the course of the investigation, law enforcement identified a total of seven (7) companies that are controlled and owned by MORANI.

          a.    UBS Forwarding Services Inc. ("UBS"). UBS was incorporated in Florida in June of 2012. According to Florida Department of State Division of Corporations public records, MORANI was listed as the owner. According to bank records, the company claimed to engage in "import and export and freight forwarding," claimed to have only two (2) employees and claimed to have $60,000 (USD) in gross annual revenue.

          b.    Compass Forwarding Inc. ("COMPASS"). COMPASS was incorporated in Delaware in November 2012. MORANI was listed as the director of the company. Identical to UBS, according to its business bank account application, COMPASS claimed to engage in "import and export and freight forwarding," claimed to have only two (2) employees and claimed to have $60,000 (USD) in annual revenue.

          c.    Integra Forwarding, Inc. ("INTEGRA"). Similar to UBS and COMPASS, INTEGRA was incorporated in Delaware in November 2012. Additionally, identical to both UBS and COMPASS, according to its business bank account application, INTEGRA claimed to engage in "import and export and freight forwarding," claimed to have only two (2) employees and claimed to have $60,000 (USD) in annual revenue. MORANI was also listed as the director of the company.

3

d.  Neddick Forwarding, Inc. ("NEDDICK").  According to public records, originally, NEDDICK was incorporated in Delaware in November 2012, with MORANI listed as the director.  However, a co-conspirator re-incorporated NEDDICK in the State of Florida in March 2016.  Additionally, identical to UBS, COMPASS, and INTEGRA, NEDDICK claimed to engage in "import and export and freight forwarding," claimed to have only two (2) employees and claimed to have $60,000 (USD) in gross annual revenue.

e.  Bamboo Logistics Corp. ("BAMBOO").  According to records, BAMBOO was incorporated in Florida on July 17, 2020, and listed a family member of MORANI as the Registered Agent and Vice President.  According to the records, BAMBOO is listed as a logistics service company.

f.  Southern Forwarding Inc. ("SOUTHERN"):  Public records show that SOUTHERN was incorporated in Florida, July 20, 2020, MORANI's family member was also listed as the Vice President and Registered Agent.  According to the investigation, SOUTHERN is also listed as being in the transportation and logistics industry.

g.  Blue Source Group LLC ("BLUE SOURCE"):  The evidence shows it was incorporated in Florida on January 8, 2021, and again, MORANI's family member was listed as the Registered Agent.  According to the business records, this was described as a real estate holdings/investment company, listing gross revenue at $50,000.

7.      Law enforcement then proceeded to investigate the legitimacy of these businesses, and quickly concluded that they were all shell corporations without any legitimate business activity.  More specifically, a review of Florida Department of Revenue found that none of the companies were contributing to the unemployment funds of the States, which means that they had no employees.  A review of Florida Department of Revenue found no wages and earnings for either MORANI or the family member who opened the accounts, which means that the companies did not file the required information with the appropriate state authority.  All companies listed the MORANI's family member's residence as the place of business.  Physical surveillance of this location did not show any evidence a commercial business, specifically on the occasions that they conducted surveillance there were no customers seen entering or exiting the residence; the cars located in front were all registered to the family members.  This did not support the listed business of "import or export" or "freight forwarding."  The agents were unable to find any legitimate online presence or associated website,[2] which in today's day and age, is not common for a legitimate business.  Moreover, a review of customs records shows no imports or exports for these purported import and export companies [3](with the exception of one export on February 6, 2018, of motorcycles from Miami (Port Everglades) to Asuncion, Paraguay).  Lastly, a search for a physical

---

[2]      While the agents were able to locate some websites for the shell corporations, they were not fully functioning, in that, they only provided an email for contact, and provided no other information, including types of services, or other items one would expect from a legitimate business.

[3]      Agents were able to find records of one export on February 6, 2018, of motorcycles from Miami (Port Everglades) to Asuncion, Paraguay, as well as one export for Learjet claiming it was under $2500 in value.  However, two purported exports over a span of five years is not consistent with a legitimate import/export business, or of a freight forwarding business.  Instead, this is consistent with these companies being shell corporations for the money remitting and money laundering enterprise.

warehouse or location where the preparation of any goods to be imported or exported came back negative.

8.      Next, agents turned their attention to the associated bank accounts for the shell corporation.  According to bank records, the defendant opened accounts for the sham corporations UBS, COMPASS, INTEGRA and NEDDICK, at Bank of America, which showed financial activity grossly disproportionate to the companies' claimed annual revenues.  For example, from January 2018 through March 2019, the sham companies received a combined total of approximately $95.5 million (USD) in electronic (wire) transfer deposits or credits from sources originating in South America, mostly Argentina.  These funds were sent in high dollar values to the accounts and were then almost immediately electronically (wire) transferred or withdrawn from the accounts resulting in very low monthly beginning and ending account balances.  Many of the incoming wire transfers were in rounded dollar figures.  Almost all of the outgoing wire transfers were in high value, rounded dollar figures that were unmatchable to any of the incoming wire transfers.  Consequently, Bank of America closed these accounts in or around July 2019.

9.      Financial records show that in July of 2019, the defendant then opened accounts in Wells Fargo for his sham companies.  According to bank records, from July 2019 through February 2021, approximately $163 million (USD) moved through these four bank accounts.  The financial transactions at Wells Fargo were similar to those at Bank of America.

10.      For example, the defendant's activity for INTEGRA in March of 2020, showed a starting balance of $205,645.24 and an ending balance of $257,763.34.  Of note, there were $7,022,576.21 in deposits and $6,970,458 in withdrawals in this single month.  A review of the activity shows that these deposits and withdrawals were all via wire transfers, mostly incoming

from Argentina.  Wells Fargo closed all of the defendant's accounts for the sham corporations in February of 2021.

11.     Moving on, the defendant then opened bank accounts for his sham corporations at Citibank.  In sum, from February 2021 through July 2021, approximately $7.7 million (USD) moved through these accounts, with transactions similar to those at Bank of America and Wells Fargo.  Citibank closed this account in November of 2021.

12.     During this time, the defendant also opened up more bank accounts for his sham corporations at JP Morgan Chase.  From October 2020 through November 2021, approximately $9 million of incoming wire transfers were received into these accounts.  JP Morgan Chase closed the accounts in November of 2021.

13.     Exhaustive records of the defendant's above-mentioned shell corporations exposed scheme that moved over $350 million in illicit proceeds through the defendant's various bank accounts and the related seven (7) shell corporations.  An analysis of those financial records clearly indicates that the shell corporations were created for the sole purpose of remitting funds through the associated bank accounts, transferring personal profits, and laundering proceeds of a yet-unknown unlawful activity.

14.     Money Services Businesses (MSBs) operating in the State of Florida require federal registration and licensing with the Financial Crimes Enforcement Network (FinCEN) and a Florida State license to act as a money transmitter.  MORANI, his coconspirators, and all his sham companies were checked by law enforcement against records with the State of Florida and FinCEN for licensing and registration as licensed MSB and the results were all negative.

15.     On April 19, 2021, law enforcement conducted a lawful search of the defendant's cellular telephones, where they discovered, among other things, pictures of invoices, text messages

and audio recordings between MORANI and the co-conspirators in which the defendant and his co-conspirators were plainly discussed, planned, and ordered the money laundering scheme, using uncoded language.   This evidence was compounded by a search of the defendant's family member's home in South Florida, where a vast amount of documentary evidence was obtained.  A review of that evidence demonstrated the breath and scope of this conspiracy.

16.     The defendant and his conspirators used bank accounts located in the Southern District of Florida associated with the seven (7) shell corporations, which were funded via wire transfers mainly from Argentina.  Due to the currency restrictions in Argentina, MORANI ordered others to create false invoices which were used to justify the wire transfer from the Argentine banks to the United States.  Almost all of the invoices supporting the wire transfer of U.S. dollars from Argentina to the subject banks were for services, mainly freight forwarding.  In fact, the conspirators did not engage in any services, much less freight forwarding, the false invoices were specifically created to circumvent the Argentine currency restriction laws mentioned above.  These false invoices were submitted to the Argentine banks to justify the Argentine Central Bank approving the wire transfer of the U.S. dollars to the bank accounts in Miami, Florida, controlled by MORANI.

17.     In order to support the wire transfers out of Argentina in U.S. dollars, MORANI instructed others to create false invoices to justify the wire transfer of U.S. dollars from Argentina to the various bank accounts owned and controlled by the defendant and listed to the sham companies the defendant opened for this purpose.  Agents recovered thousands of fake invoices that were created at the direction of MORANI, inputting on the falsity of the invoices.

18.     For example, in a text conversation exchange using WhatsApp on or about April 16, 2021, MORANI instructed his subordinate co-conspirator to "make" an invoice for three

containers and provided information for the invoice. Specifically, MORANI told his subordinate co-conspirator that s/he will receive three container numbers from "Eziquiel" to put in the invoice. MORANI then instructed his subordinate co-conspirator to add a five-digit seal number to complete the required information for the shipment.

19.     Law enforcement officers attempted to verify if the container numbers listed on the invoice were in fact legitimate. Instead, they found that the first container listed was transported from China to Belgium, and the second container listed was transported from Iran to the United Arab Emirates. Agents did not find the third container listed in its database. However, the invoice falsely states that all three containers were transported from Houston, Texas to Argentina. Agents were able to trace the amount that was transferred into the UBS Citibank account, as well as the accounting ledgers that were recovered as part of the investigation. As mentioned above, agents found thousands of fake invoices that were used to support the wire transfer of U.S. dollars from Argentina to the defendant's bank accounts.

20.     Agents also learned of additional bank accounts owned by the defendant and his co-conspirators at Morgan Stanley. However, unlike the accounts discussed above, these additional accounts appeared to be the repository of the profits from their illicit activities. In total, the Morgan Stanley accounts held approximately $18 million (U.S.). Bank records show that wire transfers from the defendant's bank accounts related to his sham corporations were sent to these Morgan Stanley accounts, which were the profits of the illegal money laundering scheme. Law enforcement obtained a seizure warrant for these funds.

21.     The defendant was approached by law enforcement in December of 2021, and through counsel, MORANI was informed that he was being investigated for operating an illegal money remitting and money laundering business. Specifically, the defendant was informed that

the above-described scheme was illegal, and that the defendant did not have a license to engage in this type of financial transactions.

22.     Agents discovered that some of the defendant's profits from his money laundering scheme were used to purchase a purchase a condominium in Miami Beach, Florida valued at approximately $2,300,000 (USD).  The condominium was purchased by a company called Infinity Evolution, LLC., with the registered agent listed as MORANI's accountant.  The listed manager at the time of purchase was one of MORANI's shell companies, INTEGRA.  However, in August of 2022, the control of Infinity Evolution, LLC., was transferred to System Failure, LLC., with an address in Fort Meyers, Florida, and the new registered agent.  Agents learned that Infinity Evolution, LLC is a company that opens corporations for individuals, and acts as their registered agent.  This company also opens bank accounts for their clients.

23.     Records from Infinity Evolution, LLC show that MORANI retained the services of Infinity Evolution, LLC not just for the purpose of being listed as the registered agent of his condominium.  Agents also discovered that Infinity Evolution, LLC. had opened a bank account at Chase bank in South Florida for MORANI.  The account was opened in August of 2022 by an employee of System Failure, LLC, however, as part of the services they provide to their clients.  Financial records show that in October 2022 there was an increase of wire transfers to Uruguay and Chile for "goods and services."  There were similar payments and wire transfers in December of 2022.  In August of 2023, the funds in the Chase account were depleted via Zelle transfers to MORANI and his co-conspirators.

24.     As mentioned above, agents also discovered that in July of 2022, the defendant and his co-conspirators hired System Failure, LLC. to open new corporations and bank accounts for them, where they continued to resume their illegal money remitting and laundering activities.

However, instead of using a family member, they recruited a new co-conspirator act as the strawman. All of the sham companies and bank accounts were opened in the strawman's name, not in the name of the defendant.

25.     Agents found an account opened by the strawman at Bank of America for a sham corporation opened at the instruction of the defendant and his co-conspirators. This was for a shell corporation that MORANI had opened in the name of ATLAS. Although MORANI and his co-conspirators' names do not appear on either the corporate records or at the financial institution, based on the evidence obtained, MORANI is the de facto owner of both the companies and the bank accounts.   Records show that from the time the bank account was opened in July of 2022, through the subpoena return in December of 2023, the account had over $14 million in incoming wires, and around $13.95 million in outgoing wires. The movement of the money was exactly the same as those in the prior accounts/corporations opened by MORANI. Analysis of the IP addresses listed in the login history for the ATLAS account showed that the vast majority of the activity occurred in Buenos Aires, Argentina. Agents are aware that since June of 2023, the defendant has not returned to the United States, and he and his co-conspirators live primarily in Argentina.

26.     Additionally, in lawfully obtained recordings, MORANI is heard instructing Infinity Evolution, LLC to open as many businesses as possible, and his co-conspirator is recorded instructing the company to assist the strawman to pay the necessary taxes for these new companies, which in fact are controlled by the defendant.

27.     This evidence clearly demonstrates MORANI and his co-conspirators are setting up new money remitting businesses in the Southern District of Florida, but are taking more precautions to ensure that their names are not related to any of the documents, companies, or accounts.

28.     As such, the evidence clearly demonstrates that MORANI was operating an illegal money remitting business, in violation of Title 18 United States Code, Section 1960, when he opened these sham corporations and associated bank accounts in the Southern District of Florida with the purpose of receiving hundreds of millions of dollars from Argentina and remitting them through the bank accounts to other recipients.  This conduct is the specified unlawful activity of the money laundering operation, per Title 18 United States Code, Section 1956(c)(7) and Title 18 Title 18 United States Code, Section 1961(1) (citing section 1960 "relating to illegal money transmitters").

29.     Based on the foregoing facts, your Affiant submits that probable cause exists to believe that PAUL OSWALD MORANI, while in the Southern District of Florida, and elsewhere, did knowing conspire with at least one person to launder monetary instruments, with a specified unlawful activity of engaging in an illegal money remitting business, all in violation of Title 18, United States Code, Sections 1956(h) and 1956(a)(2).

**FURTHER AFFIANT SAYETH NAUGHT.**

PATRICK BETTERS
SPECIAL AGENT
DRUG ENFORCEMENT ADMINITRATION

Attested to by the applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by Face Time this 19 day of March, 2024.

HONORABLE LAUREN F. LOUIS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF FLORIDA