**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-cr-20132-BLOOM**

**UNITED STATES OF AMERICA,**

      Plaintiff,

vs.

**PAUL OSWALD MORANI,**

      Defendant.

_____/

**PAUL MORANI'S SENTENCING MEMORANDUM**

Marshall Dore Louis
E. Martin De Luca*
Scott Nielson*
Boies Schiller Flexner LLP
100 S.E. Second Street
Suite 2800
Miami, FL 33131
(305) 539-8400

*Appearing pro hac vice*

*Attorneys for Paul Morani*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 4

    I.    Personal History And Characteristics of Paul Morani ........................................ 4

        A.    Mr. Morani's Childhood and Professional Experience ................................. 4

        B.    Mr. Morani is A Loving Father, Son, Husband and Brother ........................ 6

        C.    Mr. Morani's Community Service ................................................................. 8

    II.    Procedural History and Overview of the Offense ............................................. 8

    III.    Contextual Background: Argentina's Currency Controls ............................. 10

    IV.    Comparable Cases and DOJ Practice ............................................................. 14

    V.    Application of the § 3553(a) Factors Warrants a Sentence Well Below the Guidelines: This Is a Regulatory Offense, Not a Money Laundering Case ................................. 16

        A.    § 3553(a)(1) – The Nature and Circumstances of the Offense and the History and Characteristics of Mr. Morani ....................................................................... 18

        B.    § 3553(a)(2) – The Sentence Should Not Be Greater Than Necessary ....... 19

        C.    § 3553(a)(3) – The Kinds of Sentences Available ..................................... 20

        D.    § 3553(a)(4) – The Kinds of Sentence and Sentencing Range ................... 21

        E.    3553(a)(5) – Policy ..................................................................................... 23

        F.    § 3553(a)(6) – Need to Avoid Unwarranted Sentence Disparities ............... 23

            i.    A similarly situated defendant would receive a significantly lesser sentence .......... 24

                a.    Sentencing determinations for 18 U.S.C. §§1956 and 1957 cases based on an 18 U.S.C. § 1960 predicate offense ............................................................. 25

                b.    Sentencing determinations for pure § 1960 cases ................................ 26

            ii.    The Court should not increase Mr. Morani's sentence based on unproven allegations of illicit funds ............................................................................................... 28

            iii.    Section 2B1.1 ...................................................................................... 30

        G.    § 3553(a)(7) – Need for Restitution ......................................................... 31

CONCLUSION ................................................................................................................. 31

# TABLE OF AUTHORITIES

**Page**

## Cases

*Gall v. United States*,
    552 U.S. 38  (2007) ...................................................................................... 17, 20

*Kimbrough v. United States*,
    552 U.S. 85 (2007) ............................................................................................18

*U.S. v. Abraham Lorenzo Alcala*,
    Case No. 5:22-cr-00001-D (W.D. Okla. 2022)...................................................... 26, 27

*U.S. v. Keleta*,
    Case No. 1:05-cr-00371-CKK (D.D.C. 2006).....................................................26, 27, 28

*U.S. v. Mihirkumar Jayantibhai Patel*, Case No. 5:19-cr-00773-JFA (D.S.C. 2020) ...............26

*United States v. $105,824.58 Seized from Metropolitan Commercial Bank Account 0199010773,
    held in the name of "Partners Capital Investment"*,
    Case No. 22-cv-09103 (S.D.N.Y. 2022).......................................................... 2, 11, 15, 24

*United States v. Angel Rivero*,
    Case No. 1:17-cr-20475-MGC (S.D.F.L. 2017)..................................................... 26, 28

*United States v. Booker*,
    543 U.S. 220 (2005)..................................................................................17, 24, 31

*United States v. Cavera*,
    550 F.3d 180 (2d Cir. 2008) ...............................................................................17

*United States v. Diaz*,
    Case No. 1:17-cr-00077 (S.D.N.Y. 2017) ............................................... passim

*United States v. Docampo*,
    573 F.3d 1091 (11th Cir. 2009)..............................................................................23

*United States v. Elfgeeh*,
    515 F.3d 100 (2d Cir. 2008) .................................................................................30

*United States v. Jah et al.*,
    Case No. 1:04-cr-00572-LAK (S.D.N.Y. 2004). .........................................................25

*United States v. Mazza-Alaluf*,
    Case No. 1:07-cr-00403-PKC (S.D.N.Y. 2007) ..................................................... 3, 27, 28

*United States v. Mejia*,
    Case No. 8:21-cr-00008-CJC (C.D. Cal. 2021) ..........................................................25

*United States v. Mihirkumar Jayantibhai Patel*,
    Case No. 5:19-cr-00773-JFA (D.S.C. 2020)..................................................................28

*United States v. Samper,*
   Case No. 1:24-cr-20367-BB (S.D.F.L. 2024) ................................................................29
*United States v. Velastegui,*
   199 F.3d 590, 593 (2d Cir. 1999) ...............................................................................16

## Statutes

18 U.S.C. § 1956(h) ............................................................................................... 8, 9, 14
18 U.S.C. § 1957(a) ....................................................................................................... 8, 9
18 U.S.C. § 1960 .......................................................................................................... passim
18 U.S.C. § 3553 ........................................................................................................ 17, 19
U.S.S.G. § 1.1 ................................................................................................................... 22
U.S.S.G. § 1.3 ................................................................................................................... 22

## Other Authorities

*2025 Proposed Amendment (Simplification of the Three-Step Process)* (Apr. 11, 2025) ............. 17
*Alternative Sentencing in the Federal Criminal Justice System* (Jan. 2009) ................................ 21
*Designation of Former President of Argentina and Former Minister of Planning of Argentina for*
   *Involvement in Significant Corruption*,
   U.S. Dep't of State (March 21, 2025) ........................................................................... 12
*End of the Clamp: President Javier Milei's National Broadcast* (Apr. 11, 2025) ........................ 13
*Fin del dólar blue: Milei aseguró que dejará de ser ilegal comprar en cuevas*, CORTA (Dec. 21,
   2023) ............................................................................................................................ 13
*FinCEN Assesses Record $1.3 Billion Penalty against TD Bank*, (Oct. 10, 2024) ..................... 16
*Javier Milei definió como "héroes" a las personas que fugaron dólares: 'Escaparon de las*
   *garras del Estado'*, La Nación (Apr. 20, 2024), ................................................................ 1, 13
*Owners Of Miami Export Business Sentenced For $100 Million Unlicensed Money Transmitting*
   *And International Money Laundering Scheme*, DOJ (June 19, 2018) ................................. 3, 26
*Retool Mandatory Sentences*,
   New York L.J. (June 24, 2016) ..................................................................................... 21
*Why choose LSEG World-Check?*
   *Last Viewed (April 23, 2025)* ....................................................................................... 29
*Why the Federal Sentencing Guidelines Should be Scrapped*, 26 Fed. Sent. R. 6 (2013)........... 30

Defendant Paul Morani, by and through undersigned counsel, respectfully submits this Sentencing Memorandum to aid the Court in its determination of a fair and just sentence.

## INTRODUCTION

This case arises from an unlicensed money remittance business operated by Paul Morani. The business was feasible because of extraordinary economic circumstances created by Argentina's oppressive and politically-driven currency controls—regulations that have since been permanently repealed and repudiated.  These currency controls, imposed by the former administrations of Presidents Cristina Kirchner and Alberto Fernández, were widely condemned as economically damaging, politically corrupt, and explicitly anti-free market.  They forced ordinary Argentine businesses and individuals to operate outside the formal financial system and undermined the primacy of the U.S. dollar in trade.  These currency controls were widely rejected by the Argentine public, which voted to oust a continuation of the Kirchner regime in the 2023 elections.  Upon taking office, President Javier Milei moved to repeal these currency controls, calling those who helped facilitate dollar access like Mr. Morani "heroes of the free market,"[1] explicitly acknowledging their essential role in preserving legitimate economic activity during a time of governmental overreach.

To navigate these severe economic restrictions, legitimate Argentine businesses and individuals relied upon remittance services provided by people like Mr. Morani.  Crucially, these transactions did not involve illicit proceeds or concealment, nor did they intentionally facilitate drug trafficking, fraud, terrorism, or other crimes traditionally associated with money laundering

---

[1] *Javier Milei definió como "héroes" a las personas que fugaron dólares: 'Escaparon de las garras del Estado'*, La Nación (Apr. 20, 2024), available at https://www.lanacion.com.ar/politica/javier-milei-definio-como-heroes-a-las-personas-que-fugaron-dolares-escaparon-de-las-garras-del-nid19042024/.

offenses.   Rather, they reflected attempts to survive economically within a system designed primarily to benefit political insiders at the expense of ordinary citizens and legitimate commerce.

Despite the unusual context of this conduct, which is no longer criminalized in Argentina, the Government has pursued this case even though the Government has historically recognized the fundamentally different nature of cases like these from money laundering ventures.   In multiple jurisdictions—including the Central and Southern Districts of California—the Government declined criminal charges in analogous cases involving unlicensed remittance businesses that similarly helped citizens circumvent oppressive currency controls imposed by the Chinese government.   In other cases, civil enforcement was the preferred method of enforcement.

Other than Mr. Morani's case and one other case that was recently charged only as 18 U.S.C. § 1960, the Government has otherwise treated cases arising out of Argentina as civil matters rather than criminal prosecutions.   For example, in *United States v. $105,824.58 Seized from Metropolitan Commercial Bank Account 0199010773, held in the name of "Partners Capital Investment"*, Case No. 22-cv-09103 (S.D.N.Y. 2022), the Government seized the bank account that had been opened by a business posing as a mutual fund that "functioned as an unlicensed money transmission business to orchestrate, among other things, capital flight out of Argentina and other countries." *Id.*, ECF No. 1 (Verified Compliant) at 2.   The Government agreed to a civil resolution in a case involving evasion of the Argentine currency controls despite clear evidence of bank fraud and admitted money laundering exceeding $10 million, returning almost half of the seized funds and prosecuting no individuals whatsoever.   *Id.* at 2-9, ECF No. 12 (Stipulation and Order of Settlement) at 3.

Further underscoring the exceptional nature of this case, as far as we have been able to determine, the only known recent prosecution involving purely currency control evasion that the

2

Government pursued aggressively was *United States v. Diaz*, Case No. 1:17-cr-00077 (S.D.N.Y. 2017), where the defendants were convicted at trial of more serious charges (including sophisticated money laundering under § 1956). But even after trial, the court rejected the Government's request for a lengthy 12-year sentence and a $100 million money judgment. Instead, the court sentenced the defendants to 4 and 8 months, and entered an approximately $1 million money judgment. In doing so, the court recognizing the fundamentally different character and mitigated culpability of defendants whose offenses arose from foreign financial repression, rather than from traditional criminal intent or conduct. *Id.*, ECF No. 112 (Sentencing Tr.) at 67-68; ECF No. 111 (Forfeiture Order). After the Diaz's sentences were imposed, the United States issued a press release recognizing that the 4 and 8 month sentences were a "sign of the seriousness of these crimes."[2]

Mr. Morani admits that he violated 18 U.S.C. § 1960, and the defense acknowledges that the volume of money involved was substantial. Yet, as analogous cases have demonstrated, resolution of what the appropriate sentence would be is not resolved by transactional volume alone. Unlike typical money-laundering cases prosecuted under § 1960, the essence of this case involves legitimate funds, and an absence of victims, harm, or intent to defraud. It is therefore important that the Court view this case in its proper context and "look beyond the numbers."

No standalone § 1960 case involving unlicensed remittance conduct has resulted in a sentence as high as the Government requests here. Even in *United States v. Mazza-Alaluf*, Case No. 1:07-cr-00403-PKC (S.D.N.Y. 2007), a case involving bulk cash smuggling in suitcases from

---

[2] Press Release, *Owners Of Miami Export Business Sentenced For $100 Million Unlicensed Money Transmitting And International Money Laundering Scheme*, DOJ (June 19, 2018), available at https://www.justice.gov/usao-sdny/pr/owners-miami-export-business-sentenced-100-million-unlicensed-money-transmitting-and (last viewed April 23, 2025).

Colombia, deception of U.S. customs officials, and a trial conviction, the sentence was 42 months. Any such aggravating conduct is absent here. This fact underscores the exceptional nature of the requested sentence and militates strongly in favor of a lower penalty proportionate to Mr. Morani's conduct and consistent with nationwide sentencing practices.

Paul Morani has accepted responsibility and pled guilty to a violation of § 1960. He has agreed not to seek a sentence below 42 months. The government seeks the statutory maximum. In considering the appropriate sentence, the Court must exercise its discretion under § 3553(a) to Mr. Morani's individual conduct and circumstances. This memorandum explains why a sentence of no greater than 42 months is appropriate.

## ARGUMENT

### I.     Personal History And Characteristics of Paul Morani

#### A. Mr. Morani's Childhood and Professional Experience

Paul Morani is a U.S. citizen who was born in 1967 in the Bronx to an Italian-Argentine family. When he was two years old, his family moved back to Buenos Aires, Argentina where he grew up. Mr. Morani's father died when Mr. Morani was just three years old. His father's death affected him deeply, and he struggled because of his father's absence. Mr. Morani's mother was left to care for him and his sister, Iva. Mr. Morani and his immediate family moved in with his grandparents in Argentina because of these difficult circumstances. Mr. Morani eventually graduated high school and attended university in Buenos Aires for around two and a half years, studying business. He then moved to Miami when he was 20 years old to study English and business administration at Miami-Dade Community College.

After leaving school, Mr. Morani started to work in a marina for a pilot, who eventually took him on a trip back to Argentina about seven or eight years after the collapse of the military

dictatorship in the 1980s.  It was during this trip that Mr. Morani learned that Argentina was opening to imports and exports.  Through his work at the marina, Mr. Morani was introduced to and eventually started working for a freight forwarder.  Mr. Morani then started his own freight forwarding business in Miami called Total Forwarding.  Total Forwarding operated for about two years before Mr. Morani started another new business, Total Freight System.  Total Freight System closed in 1996.

That same year, Mr. Morani founded Top Cargo ("Top Cargo Miami"), which is still operating today even without Mr. Morani's involvement.  The company was heavily involved in ocean and air freight and frequently dealt with cargo heading to Argentina, Brazil, Uruguay, Paraguay, and Chile.  Mr. Morani moved back to Argentina in 1998 and took over Top Cargo's Argentina branch ("Top Cargo Argentina").  Eventually, Top Cargo Argentina grew even larger than Top Cargo Miami and employed more people than other large international freight forwarding companies.  Mr. Morani opened offices for Top Cargo in Brazil and Chile and two more offices in Argentina.  Mr. Morani had built a thriving business and was married to Carolina Hum, with whom he had four wonderful children, Mia (31), Thomas (29), Anita (27) and Francisco (25).

Later, however, Mr. Morani entered a difficult period of his life.  He separated from his wife in 2007 and his business began to struggle.  Mr. Morani declared bankruptcy in Argentina in 2009.  After encouragement from friends, Mr. Morani reentered the import-export business.  He picked himself up and got to work building yet another successful business from the ground up. Mr. Morani was once again happy and fulfilled.  But Mr. Morani made mistakes, and those mistakes include the case before the Court.

In 2021, upon arriving at Miami International Airport, federal agents seized, imaged and searched his phones.  It was around this time that Mr. Morani was informed that he was being

investigated by the U.S. Government for operating an illegal money remittance business.  The investigation resulted in a search warrant being executed in his sister's home in Miami and seizure of all the banks accounts belonging to him and his businesses.  The company accounts and the personal accounts for both Mr. Morani and his common-law spouse and co-defendant, Mery Delannoy, were frozen.

In 2023, when Mr. Morani was short on money after closing his businesses in 2021, he started another business exporting fruits and vegetables from Chile to Argentina and then from Argentina to the rest of the world.  The business sought to provide a solution to excess fruit and vegetables sourced in Chile, which were going bad or unable to be exported as the Santiago international airport had less air passenger service than Buenos Aires.  Mr. Morani was engaging in legitimate business activity, he was paying for the cargo costs up front in pesos, and when the end recipient received the cargo, they would pay Mr. Morani back for fronting the costs of the cargo in U.S. dollars.  Thus, Mr. Morani was operating an unlicensed money remittance business after he was informed that it was illegal in 2021.

Mr. Morani was arrested on March 19, 2024.  His companies have closed, and he has forfeited almost everything he owned to the United States.  Since his arrest, Mr. Morani has engaged in public service, cared for his family, and participated in activities to better himself personally.

### B.  Mr. Morani is A Loving Father, Son, Husband and Brother

Since being released on bail in April 2024, Mr. Morani has been living with his 80-year-old mother in Miami.  He helps pay her bills to the extent he is financially able to, maintains her property, and drives her to the hospital for her doctor's appointments.  His four loving adult children all moved to the Miami area to be near him during these difficult times.  Mr. Morani

continues to love and support his children.  Although he is currently unable to do so, in the past, he paid for their college tuition and medical insurance and has supported them financially.  As he has always done, he continues to provide emotional support and guidance in their personal and professional endeavors.  Mr. Morani also remains close to his sister Iva—who lives nearby—as well as Carolina Hum, the mother of his four children.

Family members speak of Mr. Morani's love for his family in the following terms:

- Mia Morani, Mr. Morani's eldest daughter, states that her "father always found ways to create meaningful moments with each of his children individually, recognizing [their] unique personalities and interests." Mia expresses her gratitude for her father's "consistent support," which "has been a foundation that has allowed [her] to persevere" in all of aspects of her life.  Mia explains that the bond between her and her father has strengthened since she relocated to Miami after losing her job in Argentina due to the public nature of the allegations against her father.  And she emphasizes that throughout her father's difficult circumstances, he "has continued to express concern for [her] well-being above his own." Ex. 1.

- Thomas Morani describes his father as "a mentor who guided [Thomas] through important life decisions" and someone who "always provided both emotional support and practical wisdom." Thomas further conveys his deep appreciation for the fact that his father "prioritized creating shared experiences that united [them] as family" and emphasized his father's "dedication to his children's individual growth, his ability to maintain family bonds despite challenges, and his ongoing positive influence in all [their] lives." Ex. 2.

- Anita Morani, Mr. Morani's youngest daughter, expresses her appreciation for her father's unwavering dedication to their relationship, and the fact that he "continue[s] to prioritize [her] well-being despite facing his own considerable difficulties." Anita states that "[o]ver the past two years, [their] relationship has strengthened remarkably." They "communicate almost daily, and [she] visit[s] him approximately three times a week." For Anita, "[t]hese frequent interactions have fostered a strong support system during this uncertain time." Ex. 3.

- Mr. Morani's youngest son, Francisco Morani describes how Mr. Morani "has always sought to nurture each of his child's individual interests and dreams" and that his father always "provided unconditional support and understanding" which allowed him "to develop a healthy sense of identity and self-worth." Francisco explains that "[e]ven amidst [his father's] legal challenges, [his] father continue[s] to provide encouragement and moral support" and expressed admiration of his father's "ability to grow as a parent, his unconditional acceptance, his support of

[his children's] educational and career aspirations, and his commitment to maintaining family unity." Ex. 4.

### C. Mr. Morani's Community Service

Mr. Morani frequently engages in charitable work within the community. He enjoys volunteering at the University Baptist Church, which is where his sister works. Mr. Morani maintains and landscapes the church grounds, performs janitorial services, and acts as the church handy man. He also spends the second and fourth Friday of every month volunteering at the Glory Temple Ministries community food program, where he helps provide food for people who can't afford to feed their families. To this day, Mr. Morani continues to serve as a steward for his community. Those familiar with Mr. Morani's volunteer work speak of his generosity in the following terms:

- Reverand Dr. Ronae Cambridge, Senior Pastor of Glory Temple Ministries in Miami, Florida described how "impressed" he was by Mr. Morani's "genuine compassion for those in need." The Reverand further stated that Mr. Morani "approaches his volunteer work with humility and respect for the dignity of those we serve" and "has shown exceptional patience and kindness when interacting with [the] community members, many of whom are experiencing difficult circumstances." He further described Mr. Morani as "a person who understands the importance of giving back and who has the capacity for positive contributions to society." Ex. 5.

## II.    Procedural History and Overview of the Offense

On April 2, 2024, Paul Morani was indicted and charged with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) and engaging in monetary transactions with criminally derived proceeds under 18 U.S.C. § 1957(a). Notably, the Government did not charge the core misconduct—operating an unlicensed money transmitting business—under § 1960, despite explicitly alleging that a § 1960 violation was the underlying "specified unlawful activity" for the money laundering charges. The Government alleged 11 transactions that traveled from Wells Fargo and Citibank accounts in Miami to two Morgan Stanely accounts as having violated

§ 1957(a).  To support the § 1956(h) charge, the Government alleged Mr. Morani (i) "knowingly" ran an unlicensed money transmitting business in violation of § 1960; (ii) "knowingly" transmitted, transported, and transferred money into and in the United States "with the intent to promote the carrying on of a specified unlawful activity" in violation of § 1956(a)(2)(A); and (iii) "knowingly" engaged in a monetary transaction utilizing interstate and foreign commerce with "criminally derived property of a value greater than $10,000 . . . having been derived from specified unlawful activity" in violation of § 1957.  The specified unlawful activity was a violation of § 1960 – not drugs or other nefarious sources of funds.

In January 2025, after extensive negotiations, the Government and Mr. Morani reached a resolution reflecting the true nature of his offense.   On February 7, 2025, he pled guilty to a single count of operating an unlicensed money transmitting business, in violation of § 1960(a), specifically for operating without the requisite license pursuant to § 1960(b)(1)(A).  This plea more accurately reflects the nature of the regulatory offense at issue—unlicensed remittance—not money laundering.

Under the plea agreement, the parties stipulated that approximately $350 million was transmitted through the business.   The agreement contains a restriction upon sentencing recommendations: the parties acknowledge a sentence below 42 months would be inappropriate, while the Government reserved the right to argue for a sentence as high as 60 months.

This case fundamentally differs from traditional money laundering prosecutions.  There was no involvement in illicit activities – either as a source or destination of the funds.  Rather, Mr. Morani conducted compliance checks (including conducting KYC and World-Check screening) and sought to ensure he only dealt with legitimate funds and transactions.  No banks—domestic

or foreign—reported financial losses, he openly kept most of his savings and assets in Florida, and there are no identifiable victims.

### III.      Contextual Background: Argentina's Currency Controls

The conduct underlying Mr. Morani's offense arose directly from Argentina's now permanently repealed currency control regime, a set of policies that distorted Argentina's economy, fostered systemic corruption and violated free-market principles aligned with U.S. interests. A fair and individualized assessment of Mr. Morani's conduct must be grounded in this broader geopolitical and economic context, which provides essential mitigation under § 3553(a).

Argentina has a long history of economic instability, characterized by inflation, devaluation of the peso, and fiscal deficits. For over a decade, Argentina maintained a dual exchange rate system under the administrations of Presidents Cristina Fernández de Kirchner and Alberto Fernández. These controls artificially pegged the peso to the U.S. dollar at an unrealistically low official rate while denying most individuals and businesses access to U.S. dollars, such as limiting individual purchases to as little as U.S. $200 per month. Meanwhile, politically connected insiders were granted preferential access to dollars, which they resold on the black market for extraordinary profit. Mr. Morani did not engage in bribery with politically connected insiders to access the official exchange rate and offer access to dollars to the public. Instead, he relied upon temporary exemptions and workarounds relating to his freight forwarding business to gain access to the official exchange rate. This system—the so-called "dollar blue" market—was an unofficial but widely used exchange rate that accurately reflected the peso's true market value. The result was a massive parallel economy operating out of necessity, not criminal intent.

The "dollar blue" was the unofficial market exchange rate, operating parallel to the official system. The discrepancy arose from erstwhile restrictions on buying foreign currency at the

official rate, leading individuals and businesses to seek dollars through unofficial channels to protect their assets from inflation or engage in legitimate transactions they otherwise would have been unable to.  The following figure provides an example of how funds move between Argentina and the United States:[3]



For individuals like Mr. Morani, operating within the confines of such a dual exchange rate system presented significant challenges.  The economic reality forced him, like many others, to navigate the complexities of the "dollar blue" market to preserve the value of their assets and conduct business.  This scenario was common in Argentina and is not inherently indicative of illicit activity but rather a response to the economic environment created by the Argentine government's currency controls.  In fact, people visiting Argentina routinely used dollars to purchase goods because that is the currency of choice and necessity.  These systemic issues drive individuals and

---

[3] The diagram is found in the Complaint (ECF No. 1) in *United States v. $105,824.58 Seized from Metropolitan Commercial Bank Account 0199010773, held in the name of "Partners Capital Investment"*, Case No. 22-cv-09103 (S.D.N.Y. 2022).

businesses to operate in ways that, while unconventional by American standards, were rational and necessary responses to the then existing Argentine economic climate.

The corruption inherent in Argentina's former currency controls was part of a broader systemic pattern of misconduct by top-level Argentine officials.  Last month, the U.S. State Department sanctioned former President Kirchner and her former Minister of Planning Julio Miguel De Vido for their involvement in "significant corruption" that "undermined democratic institutions in Argentina" and caused serious harm to the country.  Secretary of State Rubio also noted that "[m]ultiple courts have convicted CFK [former President Kirchner] and De Vido for corruption, undermining the Argentine people's and investors' confidence in Argentina's future."[4] Such designations reinforce that Argentina's currency controls were not neutral economic tools but rather instruments of state-sponsored political and financial abuse.

Faced with this reality, Mr. Morani—like many Argentinians—participated in a financial system that existed outside of the corrupt official channels.  His goal was not to hide money, launder criminal proceeds, or deceive regulators, but to meet the legitimate demand of Argentine citizens and businesses trying to preserve the value of their savings and engage in ordinary commerce.  His operation employed KYC and World-Check compliance tools to screen transactions.  There was no concealment, no structuring, and no attempt to subvert U.S. financial institutions.  This conduct, while violative of U.S. licensing requirements, does not resemble the prototypical § 1960 case.

---

[4] *See* Press Statement, *Designation of Former President of Argentina and Former Minister of Planning of Argentina for Involvement in Significant Corruption*, U.S. Dep't of State (March 21, 2025), available at https://www.state.gov/designation-of-former-president-of-argentina-and-former-minister-of-planning-of-argentina-for-involvement-in-significant-corruption/ (last viewed Apr. 23, 2025).

The government of Argentina has now repudiated the policies that created this situation. President Javier Milei, elected in November 2023 after campaigning on repealing these currency controls, moved to eliminate them when he took office and has openly praised those who resisted them, stating:

- "Dear Argentinians: I am pleased to address you with news that many of us have been waiting for a long time. A few hours ago, the Ministry of Economy and the Central Bank of Argentina broke the last link in the chain that had kept our national economy tied to the floor for 15 years. From this moment on, we are removing the currency controls from the Argentine economy *forever*."[5]

- "Today, on the free market, you can buy as many dollars as you want; it is no longer a crime. You can go and buy as many dollars as you want, and nobody will persecute you for it."[6]

- "Javier Milei defined as 'heroes' those who fled dollars because 'they managed to escape the clutches of the State'. In addition, the president made a promise to businessmen: 'I am going to pave the way for you; to the extent that Argentina begins to grow, I am going to put a foot on public spending, such that it liquefies it in terms of GDP to begin to return the money from taxes.' 'The central problem is the fiscal deficit. They have a deficit, they finance it with issuance, they lose reserves, the exchange law appears so that they cannot exchange dollars. They finance the deficit, generate inflation, and what do they do? Price controls, the shelf law appears. And what happens when they control prices? Shortages appear. The dollars are gone, they put capital controls in place and the one who flees is a criminal. He is a hero who managed to escape from the clutches of the State.'"[7]

President Milei's words encapsulate the truth long known to many Argentine and now openly recognized by their highest office: these controls were not merely flawed—they were

---

[5] Casa Rosada, *End of the Clamp: President Javier Milei's National Broadcast* (Apr. 11, 2025), available at https://www.casarosada.gob.ar/slider-principal/50929-fin-del-cepo-cadena-nacional-del-presidente-javier-milei.

[6] *Fin del dólar blue: Milei aseguró que dejará de ser ilegal comprar en cuevas*, CORTA (Dec. 21, 2023), available at https://corta.com/economia/fin-dolar-blue-milei-aseguro-dejara-ser-ilegal-comprar-cuevas-n21326].

[7] *Javier Milei definió como "héroes" a las personas que fugaron dólares: 'Escaparon de las garras del Estado'*, La Nación (Apr. 20, 2024), https://www.lanacion.com.ar/politica/javier-milei-definio-como-heroes-a-las-personas-que-fugaron-dolares-escaparon-de-las-garras-del-nid19042024/ (last viewed April 23, 2025).

oppressive, corrupt, and economically disastrous.  That truth casts Mr. Morani's actions in a profoundly different light.  He was not a criminal mastermind; he facilitated legitimate transactions in a system designed to punish market activity and reward political loyalty.

This is not the first time a U.S. court would consider such geopolitical context.  In *Diaz*, the court imposed 4 and 8-month sentences on two defendants convicted after trial of violating § 1956 and § 1960 by helping Venezuelan clients circumvent similar currency controls.  The court explicitly cited the economic conditions in Venezuela and the mitigating nature of the defendants' conduct in rejecting the government's request for a 12-year sentence.  The parallels to this case are striking and warrant similar consideration.

Sentencing Mr. Morani to the statutory maximum for conduct tied to a defunct and discredited foreign regulatory regime, especially where such conduct is now lauded by that country's own President who was elected on widespread repudiation of such as regime, does not advance the goals of § 3553.  The Argentinian government changed dramatically with the election of President Javier Milei, who moved to swiftly discontinue these policies upon taking office in December 2023.  President Milei publicly denounced the former system as corrupt, oppressive, and harmful to Argentina's economy.

The sentence advocated for by the Government, therefore, effectively enforces the repealed anti-dollar currency controls of prior Argentine governments—policies directly contrary to U.S. foreign policy interests.

## IV.    Comparable Cases and DOJ Practice

The Government's aggressive pursuit of this case contrasts sharply with its consistent practices nationwide.  Across multiple districts, similar conduct involving unlicensed money remittances that were driven by an economic need to bypass foreign currency controls of regimes

hostile to U.S. interests have been resolved either civilly or with significantly less severe criminal charges and outcomes.

In both the Central District of California ("CDCA") and the Southern District of California ("SDCA"), DOJ has declined to charge operators of unlicensed remittance businesses who solely facilitated transactions that allowed Chinese citizens to bypass China's strict currency controls without other aggravating factors. These cases generally involved minimal or no criminal penalties, emphasizing that the regulatory violations were politically driven rather than reflective of typical money laundering conduct.

The case most directly analogous to Mr. Morani's is *United States v. Diaz*, Case No. 1:17-cr-00077 (S.D.N.Y. 2017). In *Diaz*, the defendants operated an unlicensed money transmitting business that facilitated over $100 million in transfers, directly evading currency controls imposed by the Venezuelan government of President Nicolas Maduro. *Id.*, ECF No. 112 (Sentencing Tr.) at 8. Unlike Mr. Morani, however, the *Diaz* defendants were convicted at trial of § 1956 violations, facing sentencing guidelines recommending approximately 12 years of imprisonment. *Id.*, ECF No. 13 (Indictment) at 4. Nevertheless, recognizing the mitigating economic and political realities surrounding Venezuelan currency controls, the court imposed sentences of just 8 months for the senior defendant and 4 months for his co-defendant and son, explicitly rejecting the Government's aggressive sentencing position. *Id.*, ECF No. 112 (Sentencing Tr.) at 68. The court also declined to issue a $100 million money judgment, instead ordering a $1 million money judgment. *Id.*, ECF No. 111 (Forfeiture Order).

Further, in another highly relevant matter involving Argentina's defunct currency controls, *United States v. $105,824.58 Seized from Metropolitan Commercial Bank Account*, Case No. 22-cv-09103 (S.D.N.Y. 2022), the Government pursued only civil forfeiture, not criminal charges,

despite clear evidence of money laundering, bank fraud, and over $10 million illegally transmitted through U.S. accounts in a single year.  Notably, the Government even agreed to return nearly half of the forfeited funds, a vastly more lenient approach than the criminal charges and stringent forfeiture imposed here.  *Id.* at 2-9, ECF No. 12 (Stipulation and Order of Settlement) at 3.

Imposing a sentence in excess of 42 months would risk severe unwarranted sentencing disparities between Mr. Morani and other similarly situated defendants.

### V.    Application of the § 3553(a) Factors Warrants a Sentence Well Below the Guidelines: This Is a Regulatory Offense, Not a Money Laundering Case

Congress enacted § 1960 primarily to combat money transmitting businesses used to launder proceeds derived from *unlawful enterprises*, such as narcotics trafficking, terrorism, and organized crime.  *See United States v. Velastegui*, 199 F.3d 590, 593 (2d Cir. 1999) (citing S. Rep. No. 101-460, at 14 (1990), reprinted in 1990 U.S.C.C.A.N. 6645, 6658-59).  The conduct involved in this case falls outside of the criminal activity that was the driving concern for enactment of § 1960.  There is no evidence that Mr. Morani knowingly transmitted funds associated with criminal activities.  Indeed, throughout the operation of his business, Mr. Morani employed compliance measures, including customer due diligence and World-Check screenings, to prevent transactions involving illicit proceeds.

Significantly, after years of exhaustive investigation and $350 million transmitted, the Government identified only one transaction—totaling $30,000, or 0.0086% of the total funds transmitted—as allegedly connected to illegal activity, and even then, by the Government's own admission, with no evidence of Mr. Morani's knowledge or complicity.[8]  Despite the absence of

---

[8] Compare this transaction against the performance of TD Bank, which was fined $1.3 Billion for its failings.  Press Release, *FinCEN Assesses Record $1.3 Billion Penalty against TD Bank*, (Oct. 10, 2024), available at https://www.fincen.gov/news/news-releases/fincen-assesses-record-13-

any material involvement in criminally derived funds, Mr. Morani has been asked to forfeit nearly all his assets, including his life savings, underscoring the already severe consequences he has faced.

Under 18 U.S.C. § 3553(a), courts are to impose a sentence "sufficient, but not greater than necessary" to achieve the statutory goals of sentencing set forth in § 3553(a)(2). In imposing sentence, the sentencing judge must give consideration to (1) the nature of the offense and history and characteristics of the defendant; (2) the purpose of sentencing; (3) the kinds of sentences available; (4) the Sentencing Guidelines; (5) pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted disparities among similar offenders; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

Post *Booker*, it is now "emphatically clear" that the "Guidelines are guidelines – that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). The Guidelines are no longer "the only consideration" at sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). Rather, the Guidelines merely provide a "starting point" for the Court's sentencing considerations. *Cavera*, 550 F.3d at 189.[9] The guideline calculation is a starting point, but a court should not presume "that the Guidelines range is reasonable." *Gall*, 552 U.S. at 50. Instead, a

---

billion-penalty-against-td-bank (last viewed Apr. 23, 2025) ("As a result of these failures, TD Bank allowed trillions of dollars in transactions annually to go unmonitored for potentially suspicious activity that would require reporting to FinCEN. Specifically, during the time period covered by the Consent Order, TD Bank willfully failed to file Suspicious Activity Reports (SARs) on thousands of suspicious transactions—totaling approximately $1.5 billion.").

[9] In recognition of *Booker*, amendments have been proposed to the Guidelines to simplify them. The amended manual is proposed to be "structured to reflect the advisory sentencing scheme established following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), recognizing both essential steps of the court's inquiry in imposing a sentence "sufficient, but not greater than necessary." U.S. Sentencing Comm'n, *2025 Proposed Amendment (Simplification of the Three-Step Process)*, at 89-90 (Apr. 11, 2025), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202504_prelim-rf.pdf (last viewed Apr. 23, 2025).

sentencing court should impose sentence after "mak[ing] an individualized assessment based on the facts presented" in each particular case.  *Id*.  And the Court need not find "extraordinary circumstances to justify a sentence outside of the Guidelines range."  *Id.* at 47.

The Supreme Court's decisions in *Gall* and *Kimbrough v. United States*, 552 U.S. 85 (2007) significantly broadened the discretion of courts to impose a less stringent sentence than the one suggested by the Guidelines, and in this case the Court should exercise its broad discretion and impose a sentence below the maximum sought by the Government.

### A.  § 3553(a)(1) – The Nature and Circumstances of the Offense and the History and Characteristics of Mr. Morani

The nature of the offense here distinguishes it significantly from the heartland of § 1960 prosecutions.  Rather than facilitating illicit activities, Mr. Morani's unlicensed money transfer business provided a necessary economic lifeline, enabling legitimate businesses and individuals in Argentina to engage in legitimate commerce that would otherwise have been prevented by restrictive and politically corrupted currency controls.  The violation was fundamentally regulatory in nature, devoid of any intention to engage in illicit transactions or harm financial institutions or third parties.

Additionally, the history and characteristics of Mr. Morani weigh heavily in favor of leniency.  He has no significant criminal history and has demonstrated exemplary compliance with all conditions imposed by probation.  Throughout these proceedings, he has taken responsibility for his actions, expressed sincere remorse, and has actively continued to contribute positively to the community, volunteering at local organizations such as University Baptist Church and Glory Temple Ministries' food assistance programs.

### B.  § 3553(a)(2) – The Sentence Should Not Be Greater Than Necessary

A sentence of no more than 42 months of incarceration is sufficient to fulfill the objectives of § 3553(a)(2).

First, with respect to subsection (A), a sentence of 42 months reflects the seriousness of the offense, promotes respect for the law, and provides just punishment.  Although the transmission business Morani's conduct was not intended to drive or support illicit activities.  It grew out of the realities of the Argentine regulations that existed at the time, and did not rise from an intent to harm.  There were no financial losses, and for the greater part of his activities, Mr. Morani was unaware that his business required registration; it was only after the Government's investigation had already begun that he learned this fact.  He used U.S. banking channels, conducted KYC for each transaction, and employed compliance tools like World-Check to ensure that he was not transmitting illicit funds.

Second, under subsection (B), the goals of both specific and general deterrence are already fully satisfied.  Mr. Morani has no prior criminal history, has complied with all pretrial supervision obligations, and has accepted responsibility from the outset.  He has paid a steep price financially and reputationally.  He has also agreed to forfeit nearly all of his earnings and personal savings— an extraordinary consequence that itself sends a clear message.  This prosecution has been widely covered in the press, including in Argentina, and has achieved deterrence far beyond any additional months of incarceration.  Nothing more is necessary to prevent either Mr. Morani or similarly situated individuals from engaging in similar conduct.

Third, subsection (C) asks whether further incarceration is needed to protect the public.  The answer is plainly no.  Mr. Morani is not a danger to society.  He is a peaceful, hardworking

individual who has lived a productive life and who made a mistake under extraordinary economic and regulatory circumstances.  He poses no risk of recidivism.

Fourth, with respect to subsection (D), no additional term of incarceration is needed to provide education, vocational training, or medical care.  Mr. Morani is not in need of rehabilitation.  Any additional time in prison would serve no corrective function and would only impose unnecessary hardship on him and his family.

In the plea agreement, the parties jointly recommended a sentence of no less than 42 months.  The defense fully acknowledges and respects that agreement, and does not seek to undermine or evade its terms.  However, the Government's request for the statutory maximum requires that it be weighed against Mr. Morani's position, and ultimately, the Court retains independent authority to impose a sentence that is "sufficient, but not greater than necessary" to accomplish the goals of § 3553, *see Gall*, 552 U.S. at 47-50.

This case is unlike the typical § 1960 prosecution.  Mr. Morani did not knowingly deal in the proceeds of criminal enterprises or engage in transactions that he was willfully blind to.  His conduct arose in the context of uniquely repressive and now-repealed Argentine currency controls.  In fact, the market for the business at issue here no longer exists as it has evaporated following the lifting of the currency controls.  Moreover, had the Government originally charged this case under the more applicable guideline—§ 2S1.3, rather than § 2S1.1—the resulting advisory sentencing range would likely have been 0–6 months.

### C.  § 3553(a)(3) – The Kinds of Sentences Available

Under § 1960, the Court is authorized to impose any sentence up to 60 months' imprisonment, including alternatives such as probation or supervised release where appropriate.  Within that range, the parties have stipulated that a sentence of no less than 42 months is

recommended under the plea agreement.  Because the government seeks the maximum sentence, Mr. Morani must, as he has done, point out to the Court why a 60-month sentence in this case would be excessive.

Prison is most appropriate for defendants who either need to be separated from society for society's protection or those who would learn or benefit from incarceration.[10]  Applying these principles to Mr. Morani's case readily yields the conclusion that imposing a 60-month prison sentence on Mr. Morani would be inconsistent with the instruction of § 3553.  The conduct at issue does not call for it, and Mr. Morani is of the age where prison could easily cause his health and well-being to deteriorate.  He is also unlikely to reoffend.

**D.  § 3553(a)(4) – The Kinds of Sentence and Sentencing Range**

Under this factor, the Cout must consider "the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guideline."  Mr. Morani pleaded guilty to a single count of operating a money transmitting business without the appropriate license under 18 U.S.C § 1960(a).  Here, Mr. Morani wants to be clear – he agrees to the guideline range in the plea agreement.  But given the Government's insistence that Mr. Morani receive the maximum sentence available under

---

[10] *See, e.g.*, U.S. Sentencing Comm'n, *Alternative Sentencing in the Federal Criminal Justice System*, at 1, 20 (Jan. 2009), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/alternatives/20090206_Alternatives.pdf (last viewed Apr. 23, 2025) (observing that "[i]ncreasingly, criminal justice professionals have argued that dwindling prison space should be reserved for the most serious and dangerous offenders, necessitating a reconsideration of alternative sanctions for first-time and nonviolent offenders." And that alternatives to incarceration "provide those offenders opportunities by diverting them from prison (or reducing time spent in prison)"); *see also, e.g.*, Hon. Raymond Dearie, *Retool Mandatory Sentences*, New York L.J. (June 24, 2016), available at https://www.bloomberglaw.com/document/X1073TA4000000?jcsearch=1202760853093#jcite (last viewed Apr. 23, 2025) (advocating reserving prison cells "for the violent and those who victimize irreparably" and thinking seriously "about the wisdom and need of incarcerating non-violent first offenders whose only real victims are themselves").

§ 1960, it is appropriate for the Court to consider what the Sentencing Guidelines (absent Mr. Morani's agreement) would recommend for his count of conviction under the circumstances of this case.

Mr. Morani was convicted of violating § 1960(a) because he operated an unlicensed money transmission business in violation of § 1960(b)(1)(A). Absent Mr. Morani's agreement, § 2S1.3, not § 2S1.1, would be used to calculate Mr. Morani's guidelines. *Compare* U.S.S.G. § 1.3, Commentary, Statutory Provisions ("18 U.S.C. § 1960 (but only with respect to unlicensed money transmitting businesses as defined in 18 U.S.C. § 1960(b)(1)(A) and (B)") *with* U.S.S.G. § 1.1, Commentary, Statutory Provisions ("18 U.S.C. §§ 1956, 1957, 1960 (but only with respect to unlicensed money transmitting businesses as defined in 18 U.S.C. § 1960(b)(1)(C))").

Under § 2S1.3, the guidelines in this case would be calculated as follows:

| | |
|---|---|
| Base Offense Level 6 | § 2S1.3(a)(2) |
| + 28 (Loss) | § 2B1.1(b)(1)(O) |
| Reduced to 6 | § 2S1.3(b)(3)[11] |

---

[11] Subsection 2S1.3(b)(3) calls for the reduction of the Base Offense Level to 6, if the following six factors are true:

(1) § 2S1.3(a)(2) applies;
(2) There is no showing that the funds were proceeds of unlawful activity, or were intended to promote unlawful activity; and the offense did not involve bulk cash smuggling;
(3) The defendant was not convicted of an offense under subchapter II of chapter 53 of title 31, United States Code;
(4) The defendant did not act with reckless disregard of the source of the funds;
(5) The funds were the proceeds of lawful activity;
(6) The funds were used for a lawful purpose.

The offense involved $350,000,000, and the Government contends that $30,000 was involved in illicit activities. Mr. Morani has objected to this factual recommendation in the Presentence Investigation Report. Absent a finding that the offense included these illicit funds, § 2S1.3(b)(3) would apply.

+ 4 (Leader)                        § 3B1.1(a)

- 2 (Acceptance)                    § 3E1.1(a)

Total Offense Level:   8

Although the plea agreement binds the parties to a particular Guidelines calculation under § 2S1.1, it is relevant for the Court to understand the significant disparity resulting from that stipulated calculation.  Absent the plea agreement, use of U.S.S.G. § 2S1.3 would yield Total Offense Level of 8, corresponding to a range of 0-6 months incarceration.  This drastic variance underscores the disproportionate severity of the Government's recommended sentence and further supports a sentence no greater than 42 months.

### E.   3553(a)(5) – Policy

We are not aware of any pertinent policy statements that are relevant to this Court's sentencing determination in this case.

### F.  § 3553(a)(6) – Need to Avoid Unwarranted Sentence Disparities

A critical factor under § 3553(a)(6) is the need to avoid sentencing disparities among defendants with similar culpability and conduct.  The importance of avoiding unnecessary sentencing disparities is beyond question.  In *Gall*, the Court explained that § 3553(a)(6) requires courts to ensure that defendants with similar culpability receive similar punishment, unless meaningful distinctions exist.  552 U.S. at 54-55, s*ee also United States v. Docampo*, 573 F.3d 1091 (11th Cir. 2009) (emphasizing district judges should avoid sentencing disparities among defendants with similar criminal conduct and records unless justified by specific factors).  The Supreme Court has explained that the Sentencing "Act without its 'mandatory' provision and related language remains consistent with Congress' initial and basic sentencing intent.  Congress sought to 'provide certainty and fairness in meeting the purposes of sentencing, [while] avoiding

unwarranted sentencing disparities . . . [and] maintaining sufficient flexibility to permit individualized sentences when warranted.'" *Booker*, 543 U.S. at 264.

Here, as discussed above, there are few if any cases that are on point. However, there are other matters from which comparisons can be drawn that are useful in considering where Mr. Morani's sentence should fall.

### i. A similarly situated defendant would receive a significantly lesser sentence

The Government and Mr. Morani agreed to calculate his Base Offense Level under § 2S1.1 of the Sentencing Guidelines. The agreed upon guidelines calculation (including role enhancement) results in a Total Offense Level of 37, for which the Sentencing Guidelines recommend 210-262 months incarceration.

However, as set forth above, a similarly situated defendant who plead guilty to the same failure to register offense would have their sentence calculated under § 2S1.3 of the Sentencing Guidelines—not § 2S1. Applying § 2S1.3 to a similarly situated defendant would result in a Total Offense Level of 8, Criminal History Category I, corresponding to 0 to 6 months range. It also should be noted that other cases involving similar, if not significantly worse facts, have resulted in civil forfeiture proceedings, not criminal prosecutions. *See, e.g.*, *United States v. $105,824.58 Seized from Metropolitan Commercial Bank Account 0199010773, held in the name of "Partners Capital Investment"*, Case No. 22-cv-09103 (S.D.N.Y. 2022).

Thus, if prosecuted, a similarly situated defendant would be exposed to a guideline range of 0 to 6 months.

### a. Sentencing determinations for 18 U.S.C. §§1956 and 1957 cases based on an 18 U.S.C. § 1960 predicate offense

The cases we identified where defendants were sentenced upon violations of § 1956 or § 1957, based on a predicate specified unlawful activity of § 1960, indicate a tendency for relatively low sentences for defendants. The highest sentence for any defendant was 41 months. The average sentence was 22 months. The lowest sentence was 4 months.

| Case | Charges | Resolution | Sentence |
|------|---------|------------|----------|
| *U.S. v. Diaz*[12] | 18 U.S.C. § 1956 and § 1960 | Jury Conviction | 4 Months (Defendant 1) 8 Months (Defendant 2) |
| *U.S. v. Jah et al.*[13] | 18 U.S.C. § 1956 and § 1960 | Guilty Plea – All 3 defendants plead guilty to § 1960 offense | 18 months (Defendant 1) 27 Months (Defendant 2) 41 Months (Defendant 3) |
| *U.S. v. Mejia*[14] | 18 U.S.C. § 1956 and § 1960 | Guilty Plea – Defendant admitted that his business accepted drug trafficking proceeds | 36 Months |

*United States v. Diaz* is the only case we identified in which DOJ pursued through trial § 1956 charges against unlicensed remitters that was based solely on circumventing foreign currency controls. Case No. 1:17-cr-00077 (S.D.N.Y. 2017), ECF No. 112 (Sentencing Transcript) at 67-71. Despite securing convictions at trial, the court in *Diaz* rejected the Government's push for a 12-year sentence, instead sentencing the defendants to 4 and 8 months in prison. *Id.* The court explicitly acknowledged that the economic realities of Venezuela, and the currency controls involved in that country, mitigated the offense. *Id.* Similarly, while the government sought a $100

---

[12] *United States v. Diaz*, Case No. 1:17-cr-00077 (S.D.N.Y. 2017).
[13] *United States v. Jah et al.*, Case No. 1:04-cr-00572-LAK (S.D.N.Y. 2004).
[14] *United States v. Mejia*, Case No. 8:21-cr-00008-CJC (C.D. Cal. 2021).

million money judgment based on the total amount transmitted, the court imposed a judgment of only $1 million, reflecting its view that the government's approach was disproportionate. And, after those sentences were handed down, the government did not criticize them, the government did not remain silent, the government did not appeal, instead, the government praised them as "a sign of the seriousness of these crimes."[15]

### b. Sentencing determinations for pure § 1960 cases

Comparable cases in which the Government charged defendants with a violation of § 1960, without bringing any other charges, also indicate a tendency for sentences that are either lower (or in one instance, the same) as that Mr. Morani agreed to recommend. The highest sentence for any defendant was 42 months. The lowest sentence was probation. The average sentence was 22 months.

| Case | Charges | Resolution | Sentence |
|---|---|---|---|
| *U.S. v. Keleta*[16] | 18 U.S.C. § 1960 | Jury Conviction – <br><br> Two counts of 18 U.S.C. § 1960 | 31 Months |
| *U.S. v. Mihirkumar Jayantibhai Patel*[17] | 18 U.S.C. § 1960 | Guilty Plea | 6 Months |
| *U.S. v. Abraham Lorenzo Alcala*[18] | Charged with one count of conspiracy to possess with intent to distribute meth | Guilty Plea – <br><br> Defendant plead guilty to one count of 18 U.S.C. 1960 | 30 Months |
| *U.S. v. Angel Rivero*[19] | 18 U.S.C. § 1960 | Guilty Plea | Probation |

---

[15] Press Release, *Owners Of Miami Export Business Sentenced For $100 Million Unlicensed Money Transmitting And International Money Laundering Scheme*, DOJ (June 19, 2018), available at https://www.justice.gov/usao-sdny/pr/owners-miami-export-business-sentenced-100-million-unlicensed-money-transmitting-and (last viewed April 23, 2025).

[16] *United States v. Keleta*, Case No. 1:05-cr-00371-CKK (D.D.C. 2006).

[17] *United States v. Mihirkumar Jayantibhai Patel*, Case No. 5:19-cr-00773-JFA (D.S.C. 2020).

[18] *United States v. Abraham Lorenzo Alcala*, Case No. 5:22-cr-00001-D (W.D. Okla. 2022).

[19] *United States v. Angel Rivero*, Case No. 1:17-cr-20475-MGC (S.D.F.L. 2017).

| *U.S. v. Mazza-Alaluf*[20] | 18 U.S.C. § 1960 | Bench Trial Conviction | 42 Months |

These cases weigh in favor of a sentence of no greater than 42 months. For example, in *United States v. Mazza-Alaluf* the defendant's conduct included bulk cash smuggling from Colombia and Chile, two countries that had no currency controls like Argentina did, which made the bulk cash smuggling in suitcases unlikely to have an innocent logical explanation. That defendant was also involved in repeated deception of U.S. Customs, and the transportation of illicit cash through U.S. airports—none of which is present in this case. *United States v. Mazza-Alaluf*, Case No. 1:07-cr-00403-PKC (S.D.N.Y. 2007), ECF No. 9 (Indictment).

In *United States v. Abraham Lorenzo Alcala*, the defendant was originally charged with one count of conspiracy to possess with intent to distribute meth and pleaded guilty to violating 18 U.S.C. § 1960(b)(1)(C). Case No. 5:22-cr-00001-D (W.D. Okla. 2022), ECF Nos. 60 (Indictment) & 143 (Plea Agreement). Unlike Mr. Morani, Mr. Alcala was guilty of knowingly transmitting illicit funds. Moreover, Mr. Acala's sentence was calculated under a different section in the Sentencing Guidelines because he pleaded guilty to § 1960(b)(1)(C), whereas Mr. Morani pleaded guilty to § 1960(b)(1)(A).

And in *United States v. Keleta*, the defendant was convicted, after a trial, of two counts of operating an unlicensed money transmitting business—Mr. Morani only pleaded guilty to a single count. Case No. 1:05-cr-00371-CKK (D.D.C. 2006), ECF No. 36 (Judgment).

The plea agreement's recommendation of a 42-month sentence would place Mr. Morani's punishment on par with the longest sentence imposed for a standalone violation of § 1960. But that *Mazza-Alaluf* involved starkly different facts. The defendant was convicted at trial for running an international remittance business that included bulk cash smuggling from Colombia, a country

---

[20] *United States v. Mazza-Alaluf*, Case No. 1:07-cr-00403-PKC (S.D.N.Y. 2007).

with no currency controls, and repeated deception of U.S. Customs officers.  By contrast, Mr. Morani accepted responsibility early, transmitted funds transparently through banks, did not engage in bulk cash smuggling, and took measures to avoid transactions involving illicit proceeds.

Mr. Morani's circumstances are more akin to the defendants in *United States v. Mihirkumar Jayantibhai Patel* and *United States v. Angel Rivero*, who pleaded guilty to a single violation of 18 U.S.C. § 1960.[21]  Like Mr. Morani, Mr. Patel and Mr. Rivero intended no harm and were not engaged in the movement of illicit funds.[22]  While Mr. Patel and Mr. Rivero were found to have transmitted less funds than Mr. Morani did here, their circumstances are still a better guidepost for Mr. Morani's sentencing determination than *Mazza-Alaluf* (bulk cash smuggling from Latin America, repeated deception of U.S. Customs, and the transportation of illicit cash through U.S. airports), *Alcala* (originally charged with one count of conspiracy to possess with intent to distribute meth and guilty of knowingly transmitting illicit funds) and *Keleta* (convicted of multiple counts of operating an unlicensed money transmitting business).

### ii. The Court should not increase Mr. Morani's sentence based on unproven allegations of illicit funds

The Government alleges that $30,000 of the $350,000,000 transmitted through Mr. Morani's business was connected to illicit activity—but there is no evidence of his involvement or his knowledge of any connection to such illicit activity.  Not only is the Government's allegation

---

[21] *See United States v. Mihirkumar Jayantibhai Patel*, Case No. 5:19-cr-00773-JFA (D.S.C. 2020), ECF No. 108 (Plea Agreement); *see also United States v. Angel Rivero*, Case No. 1:17-cr-20475-MGC (S.D.F.L. 2017), ECF No. 18 (Plea Agreement).

[22] Mr. Rivero, in his stipulated factual proffer, seems to suggest that he thought it was possible that the checks he was cashing for another individual could have been related to something illegal, however, the court did not appear to take this into consideration when calculating his sentence. *See United States. v. Angel Rivero*, Case No. 1:17-cr-20475-MGC (S.D.F.L. 2017), ECF No. 19 (Stipulated Factual Proffer) at 2.

unsupported by any evidence, but it also runs into the fact that Mr. Morani employed World-Check to guard against involvement in any transactions with funds derived from or intended to promote illicit activity.[23]  Even if the Court accepts the Government's allegation concerning these funds, the amount of money alleged to be connected to illicit activity is *de minimis* (0.0086% of the total funds transmitted).  It is also the only transaction of its kind identified by the Government, after years investigating the case.

Assuming, *arguendo*, that this Court accepts the allegation and overrules Mr. Morani's objection, the $30,000 transaction would not support the drastic increase in Mr. Morani's sentence that would result under the guidelines (or that is urged by the Government).  This Court's recent sentencing determination in *United States v. Samper* illustrates this point.  Case No. 1:24-cr-20367-BB (S.D.F.L. 2024).  The defendant in *Samper* participated in a sophisticated international money laundering conspiracy that facilitated the transfer of cash proceeds from illegal drug sales in the United States to leaders of drug trafficking cartels in Mexico through cryptocurrency.  *Id.*, ECF No. 68 (Indictment) ¶ 1.  The defendant pleaded guilty to a single count of § 1960 and stipulated to transmitting approximately $100,000 in illicit proceeds.  *Id.*, ECF No. 125 (Factual Proffer) at 3.  The defendant knew of the illicit nature of the funds and indeed received some of the money in a parking lot in cash.  This Court sentenced Mr. Samper to 8 months incarceration.  *Id.*, ECF No. 136 (Judgment).

Standing alone, the Government's assertion that a defendant transmitted $30,000 in connection to illicit activity should yield a lesser sentence than the 8 months Mr. Samper received

---

[23] "Since its inception, World-Check has served the Know Your Customer (KYC) and third-party screening needs of the world's largest firms; simplifying day-to-day onboarding and monitoring decisions and helping businesses comply with anti-money laundering and countering financing of terrorism legislation."  *Why choose LSEG World-Check?*, https://www.lseg.com/en/risk-intelligence/screening-solutions/world-check-kyc-screening/about (last viewed Apr. 23, 2025).

for *knowingly* transmitting approximately $100,000 in illicit narcotics funds.  Here, Mr. Morani did not know, or have reason to believe, that those $30,000 were connected to illicit activity.

This single $30,000 transaction results in a 324 to 399 month difference to the guideline calculation that would otherwise apply to a defendant in Mr. Morani's circumstances (0-6 months under § 2S1.3 without an illicit transaction) against the 324-405 months recommended by the Presentence Investigation Report.  It is difficult to reconcile the approximately 30-year disparity that results solely from the finding of unknowing participation in a single $30,000 illicit transaction.  This is especially true where a defendant being sentenced for the same transaction standing alone (knowing full well that he was laundering drug proceeds), would likely receive a sentence of 8 months or less.

### iii.   Section 2B1.1

The Court should consider that the guidelines in this case are driven by dollar amount, and not intent.  The loss table that applies in cases where victim's life savings are stolen equally applies here where people's funds were preserved through capital flight and Argentinians were able to obtain goods from abroad.  The cold calculations of § 2B1.1 do not differentiate between a defendant who steals $350 million from victims of a fraud and one who transmits $350 million in violation of regulations that they need not even be aware of.[24]  The Honorable Jed S. Rakoff has written about the "overwhelming focus" the guidelines place on a single factor, simply because that factor is easier to measure than other, equally important factors.[25]  The cost of treating loss as "the be all and the end all" is that the Guidelines range that results, and that continues to serve as

---

[24] To prove a violation of § 1960, the government only need show that Mr. Morani knew he did not have a license to act as a money transmitter, not that he knew he needed a license.  *See United States v. Elfgeeh*, 515 F.3d 100, 132 (2d Cir. 2008).

[25] Hon. Jed S. Rakoff, *Why the Federal Sentencing Guidelines Should be Scrapped*, 26 Fed. Sent. R. 6, 7 (2013).

a starting point in the post-*Booker* world, according to Judge Rakoff, does not "fairly convey the reality of the crime or the criminal."[26]

This is the case for Mr. Morani.[27]  Mr. Morani acknowledges his agreement to a guideline calculation in the plea agreement but in considering how to weigh the Government's recommendation (max) against Mr. Morani's (42 months), the Court should consider the overwhelming impact the fraud loss table has in driving the guidelines in this case – which does not involve fraud, loss, intentional victimization or money laundering.

### G.  § 3553(a)(7) – Need for Restitution

This factor requires the Court to consider "the need to provide restitution to any victims of the offense."  But here, there is nothing for the court to consider because there are no victims.  Mr. Morani's money transmission business did not victimize anybody.  It was a service (albeit illegal) that was provided to Argentinians who needed access to U.S. dollars so they could (1) preserve the value of their money and (2) access foreign markets and international trade.

### CONCLUSION

For the reasons set forth above, including the unique factual circumstances of this case, Mr. Morani's lack of nefarious intent, the extraordinary economic context surrounding his conduct, the absence of any victims or loss, and his personal background and acceptance of responsibility, a sentence of no more than 42 months is both just and sufficient to satisfy the objectives of § 3553(a).

This recommendation, contemplated in the plea agreement and supported by precedent, practice, and policy, appropriately balances the seriousness of the offense with the equally

---

[26] Rakoff, *supra* note 25, at 7.
[27] *United States v. Diaz*, Case No. 1:17-cr-00077 (S.D.N.Y. 2017), ECF No. 112 (Sentencing Tr.) at 68 (Judge Pauley finding the "guidelines' calculation . . . to be breathtaking, and . . . skewed in such a way as to be completely disconnected from the realities of th[e] case").

important principles of proportionality, fairness, and individualized justice.   Mr. Morani has already paid a substantial price through forfeiture and reputational harm and will continue to do so for the rest of his life.  Accordingly, we respectfully request that the Court impose a sentence of no greater than 42 months.

Dated: April 23, 2025

Respectfully Submitted,

s/ *Marshall Dore Louis*
Marshall Dore Louis
Florida Bar No. 512680
BOIES SCHILLER FLEXNER LLP
100 S.E. Second Street, Suite 2800
Miami, FL 33131
TEL: (305) 539-8400
FAX: (305) 539-1307
E-MAIL: mlouis@bsfllp.com

E. Martin De Luca*
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
TEL: (212) 446-2300
E-MAIL: mdeluca@bsfllp.com

Scott Nielson*
BOIES SCHILLER FLEXNER LLP
100 S.E. Second Street, Suite 2800
Miami, FL 33131
TEL: (305) 357-8424
E-MAIL: snielson@bsfllp.com

*Appearing pro hac vice*

*Attorneys for Paul Morani*